MOORE, Judge.
 

 Wehadkee Yarn Mills (“Wehadkee”) appeals from a judgment of the Talladega Circuit Court (“the trial court”) finding that Deborah Harris had suffered a permanent and total disability as a result of her on-the-job injury while working for Wehadkee. We reverse the trial court’s judgment and remand the case to the trial court.
 

 Facts
 

 Harris, who was born on December 4, 1958, testified that she dropped out of school after she completed the eighth grade. According to Harris, she began working for Wehadkee in September 1989. Harris testified that, in 2004, she began working in the lab at the Wehadkee mill. Michael Whitman, the general manager of manufacturing for Wehadkee, testified that Harris’s job as a lab technician required her to test the products made at the mill, to record the data derived from those tests, to keep records of the data, to supply the data to the customers as required, and to assist the management and other employees of Wehadkee in any type of investigation as to any quality complaints or quality-assurance issues. Harris stated that the packages of yarn that she was required to lift weighed 3 to 12 pounds and that her job required repetitive movement. According to Whitman, the packages weighed 7 to 12 pounds.
 

 Harris testified that her quality-control manager, Tony Sisk, had requested, about two weeks before her injury, that Harris
 
 *151
 
 begin taking larger quantities of yarn off the spindle because of the large amount of waste that was created when small quantities of yarn were taken for testing. On February 7, 2006, according to Harris, as she was removing a package of yarn from a spindle for testing, she felt as though she had busted a blood vessel in her right thumb. Harris testified that she had pain in her thumb at the time of the injury and that, when she went home, her hand began to swell. According to Harris, she had not suffered an injury to her right wrist, her thumb, her elbow, or her arm before she incurred her injury while working for Wehadkee. She further stated that the pain went from the base of her thumb, into her wrist, and down her ring finger and her little finger on her right hand. Harris testified that, when she woke up on the morning after the injury had occurred, her hand looked like a baseball and she could not move her wrist. She stated that she went to work that day and reported her injury to Sisk.
 
 [1]
 

 According to Harris, she first went to a doctor of her own choosing, Dr. Richard Snouffer, who told her to wear a brace for her wrist and prescribed her anti-inflammatory medication. She stated that Dr. Snouffer told her not to use her right hand for eight weeks because of the injury to her thumb and that she gave that information to Sisk. According to Harris, after she reported to Sisk and an employee named Donna, who worked in the office at the Wehadkee mill, that she had seen a doctor, Wehadkee then sent her to see Dr. Leigh Murphy at Talladega Surgery Associates on February 14, 2006. According to Dr. Murphy’s medical records, Dr. Murphy diagnosed Harris with De Quervain’s teno-synovitis in her right wrist. Dr. Murphy’s March 21, 2006, entry indicates that Dr. Murphy believed that Harris had arthritis in her wrist that had been aggravated in the preceding month. Dr. Murphy also stated that Harris had “significant digital and wrist stiffness which is unrelated to her tenosynovitis.”
 

 Harris testified that Dr. Murphy referred her to Dr. Gordon Hardy, an orthopedic surgeon, in March 2006. According to Harris, on her first visit to Dr. Hardy, he gave her a cortisone shot in her thumb. Harris stated that the cortisone shot had not done any good and that she later underwent surgery on April 11, 2006. According to Harris, at the time she had the surgery, her hand was severely swollen and very painful. She stated that, after the surgery, the severe shooting pain was gone but her injury was still very painful and her hand was still swollen. She stated that, after the surgery, she could not move her wrist and she could not write with her hand. She said the condition of her hand was about the same after the surgery. According to Harris, Dr. Hardy injected cortisone shots into her wrist a couple of months after the surgery. Harris stated that, when she followed up with Dr. Hardy after her surgery, he indicated that he thought her wrist pain was due to some type of arthritis in her wrist. She stated that Dr. Hardy referred her to Physiotherapy Associates for physical therapy at the end of April 2006 and that she was in therapy for about three months. According to Harris, the pain was not as severe after she began physical therapy. Dr. Hardy placed Harris at maximum medical improvement (“MMI”) on December 5, 2006. Dr. Hardy also gave Harris a 6% impairment rating to the body as a whole as a result of her right-thumb and wrist condition.
 

 
 *152
 
 According to Harris, after she completed physical therapy, Dr. Hardy sent her to Rehab Partners to undergo a functional-capacity evaluation (“FCE”). The FCE report indicated that Harris gave a consistent effort during the testing. The recommendations in the FCE repoi't were that lifting and carrying should not exceed 10 pounds on a frequent basis, that right unilateral carrying should not exceed 5 pounds on a frequent basis, and that right handling tasks should be limited to an occasional basis.
 

 Harris stated that Dr. Hardy also sent her to Dr. Vishala Chindalore for a onetime evaluation. Later, according to Hardy, she requested and was given a panel of four physicians from which to select a doctor for a second opinion,
 
 see
 
 § 25-5-77(a), Ala.Code 1975; she selected Dr. Richard Meyer, an orthopedic surgeon. Harris stated that she first saw Dr. Meyer on approximately December 27, 2006. She had an MRI on her right wrist and followed up with Dr. Meyer on April 5, 2007; Dr. Meyer explained to Harris at that time that, in his opinion, her wrist pain was being caused by rheumatoid arthritis rather than the injury to her thumb. Dr. Meyer placed Harris at MMI on April 5, 2007.
 

 Harris testified that she had been seeing Dr. Monica Crawford, a rheumatologist, since July 2007. She said that she had not had any wrist pain before her injury. Harris testified that none of the doctors she had visited had diagnosed her wrist injury as being a result of her incident at work. Harris stated that she had no pain above two inches above her wrist.
 

 Harris testified that she had continued to work for Wehadkee until Wehadkee went out of business in June 2007. She stated that she never returned to the job that she had been performing before her injury but that, during the last four or five months before the Wehadkee mill shut down, she did what she could with her left hand. Whitman stated that Harris was given light-duty restrictions after her injury and that Wehadkee had accommodated those restrictions by having someone else collect the packages of yarn and bring them to the lab for her. Whitman stated that he was Harris’s supervisor from November 2006 until the mill closed and that, to the best of his knowledge, Harris had not missed any work as a result of her injury. According to Whitman, by the time the Wehadkee mill closed, Harris was able to perform the majority of her job duties without restrictions, although she worked alongside another employee and would still ask for help when lifting the packages of yarn. Whitman stated that Harris had been able to perform her job, though she may have performed it slower than someone who did not have a hand injury would have.
 

 When the Wehadkee mill closed down in June 2007, Hams filed for unemployment-compensation benefits. She stated on her application for those benefits that she was eligible and ready for work. According to Harris, she received unemployment-compensation benefits for five or six months.
 

 Harris testified that she then went to work at a Wal-Mart discount department store for approximately five months. According to Harris, she worked close to full time at the Wal-Mart store as a receiving associate or a stocker, which required her to take toys out of a box and place them on the shelves. Harris testified that she could not adequately perform the work required of her at the Wal-Mart store because she was still having difficulty with her thumb, hand, and wrist. She also testified that she never should have taken that job because she was in a lot of pain trying to work and there were a lot of things that that job required that she
 
 *153
 
 could not do. She stated that her last day at the Wal-Mart store was May 28, 2008. Harris testified that, at the time of trial, she had been approved for Social Security disability benefits but had not received her first check. Harris also testified that she had taken the General Equivalency Diploma (“GED”) exam in December 2007, while she was working at the Wal-Mart store, but that she had not passed the test.
 

 Jo Spradling, a licensed professional counselor and therapist, testified that she had met with Harris on August 11, 2008, and had discussed Harris’s educational background, work history, and medical history. Spradling stated that she took that information and Harris’s FCE report, because it included Harris’s physical capacity for work, into account in determining Harris’s vocational loss. According to Spra-dling, a physical restriction is something a doctor assigns to an individual, while a physical limitation is a weakness or impairment “that a person suffers in and of himself.” Spradling testified that the FCE report reflected Harris’s physical limitations, whereas none of Harris’s physicians had performed a physical-capacity test on Harris to determine her physical restrictions. The FCE report indicated that Harris is “able to perform work in the sedentary physical demand strength level with intervention,” and it assigned Harris a 6% impairment to the body as a whole, taking into account her thumb and her wrist, and a 14% impairment to the body as a whole, when also taking her elbow into account. Spradling stated that, in her opinion, Harris is unable to return to any form of gainful employment and is 100% vocationally disabled, which, Spradling stated, amounts to a 100% loss of earning capacity.
 

 Spradling also testified that she had based her opinion on the condition of Harris’s right upper extremity and that she had not made a differentiation between the injury caused by Harris’s work accident and the overall condition of Harris’s right upper extremity. She stated that she had based her opinion on Harris’s description of her physical limitations as well as the FCE report and Harris’s medical records. Spradling testified further that Harris had no transferable skills from her previous employment because the job Harris had performed was “position-specific” and, Spradling stated, Harris would have minimal to no transferable skills for her current physical demand level.
 

 Spradling testified that she did not believe Harris would be a qualified and suitable applicant in the regional economy. She stated that she had looked at occupations in the Talladega County area that had been posted with the employment service and that she had not found any positions for which Harris was qualified. Spradling also stated that both her company and the Social Security Administration considered a return to work for six months or greater as a successful return to work and that, because Harris had worked at the Wal-Mart store for only five months, that was not considered a successful return to work.
 

 Harris testified that, at the time of the trial, she was in constant pain from her injury, which she rated at a 5 or a 6 on a scale of 0 to 10, and that simple activities, such as washing dishes, putting on makeup, or putting any pressure on her wrist, increased her pain. According to Harris, when she tried to perform those simple activities, her pain increased to 8 on a scale of 0 to 10, and she stated that, if she tried to perform more heavy-duty activities, her pain would increase even more. She stated that she took the prescription di’ugs Lortab and methotrexate for pain and that she also took ibuprofen at times instead of the Lortab because the Lortab
 
 *154
 
 caused her to fall asleep. Harris stated that she is right-handed and that, since the injury, she can lift only about five pounds with her right hand.
 

 Harris stated that, since her injury, she can no longer do certain household chores, like mopping, vacuuming, washing the dishes, and folding heavier clothing items like jeans. She stated that her daughter and her husband have to perform the housework. She stated also that her husband does the grocery shopping because she is unable to lift the grocery items. Hams stated that she had loved working in her yard before the injury but that she has been unable to enjoy that activity since her injury. She also stated that she is no longer able to sew or crochet, which were her hobbies before her injury.
 

 Harris stated that she now drives with her left hand and that she only drives short distances. She stated that she had to have her long hair cut short because she was unable to fix it with only her left hand. She also stated that, because she is not coordinated enough to put on eye makeup with her left hand, she does not wear any. She stated that she has trouble bathing and dressing herself and that her husband has to help her at times and that he also has to put her jewelry on for her. Harris further stated that she does not cook much anymore because she cannot open jars, remove things from the cabinets with her right hand, or use a manual can opener. She also stated that she has trouble cutting up food and that her husband has to cut up her steak for her. She said that she has very little ability to grip with her right hand.
 

 Harris testified that, when she wakes up in the morning, her hand is very stiff and she has to run hot water on it to help give her fingers movement. She also stated that she is unable to sleep through the night because the pain in her hand wakes her up at least twice a night.
 

 Katrina McGrady, Harris’s daughter, testified that, since Harris’s injury, she has found it necessary to visit Harris every weekend to help her around the house with chores, including cooking, because Harris cannot pick up her pots and pans; sweeping; mopping; doing laundry, because Harris cannot wash the larger items; making beds; cleaning counters, the toilet, and the bathtub; gardening; and shopping at times, because Harris is unable to carry grocery bags. McGrady also stated that she assists Harris by writing checks for Harris’s bills. McGrady further stated that she had witnessed Harris crying and holding her hand and that she can tell Harris is in pain almost every weekend when she visits.
 

 Procedural History
 

 Harris filed a complaint against Wehad-kee on May 14, 2007, seeking workers’ compensation benefits as the result of her injury. Wehadkee filed an answer to Harris’s complaint on June 29, 2007.
 

 Following ore tenus proceedings on August 26, 2008, the trial court entered a final judgment on September 22, 2008, in which it made the following findings, among others:
 

 “13. The Court finds that the injuries to [Harris’s] upper extremity, and the resulting pain and disability therefrom, extends to other parts of her body and interferes with their efficiency in accordance with the tests adopted in the case of
 
 Ex parte Drummond Company, Inc. v. Kenneth C. Pate,
 
 837 So.2d 831 [(Ala.2002)];
 

 “14. The Court further finds that [Harris] suffers from chronic pain which is severe, excruciating, and debilitating in accordance with the pain outlined in the case of
 
 [Masterbrand Cabinets, Inc.
 
 
 *155
 

 v. Johnson,
 
 984 So.2d 1136 (Ala.Civ.App.2005), aff'd,
 
 Ex parte Masterbrand Cabinets, Inc.,
 
 984 So.2d 1146 (Ala.2007)], and that this pain within itself precludes [Harris] from engaging in any reasonable, gainful employment;
 

 “15. This Court was impressed by [Harrisj’s demeanor, which was borne out by the testimony at trials to the effect that [Harris] was an excellent employee during the 17 years she was employed by [Wehadkee] up until her injury, that, following her injury, [Harris] made every effort to accomplish all that she could and to be helpful in whatever she was assigned, the determination of Rehab Partners that [Harris] exerted maximum effort in the Functional Capacities Evaluation tests, as well as her effort to return to full time employment following the closing of [WehadkeeJ’s facility, and this Court finds that [Har-risj’s testimony is very credible. Based upon the foregoing, as well as all of the proof in this case, this Court finds that [Harris] is permanently and totally unable to perform [Harrises trade and is permanently and totally unable to obtain any type reasonable gainful employment, and the Court finds that [Harris] suffers a 100% permanent and total disability to the body as a whole with a consequent 100% loss of earning capacity;
 

 “16. The Court finds that [Harrises permanent and total disability is the proximate result of [Harris’s] on-the-job injuries that [Harris] testified to in open court;
 

 “17. [Harris] has not refused to undergo physical or vocational rehabilitation that she is able to perform and based upon [Harrisj’s educational background and work experience [Harris] may not ever be rehabilitated;
 

 “18. [Harrises average weekly wage for the 52 week period of time prior to the date of her injury was Five Hundred, Fifty-two and 00/100 ($552.00), as stipulated to above, making [Harrises compensation rate be Three Hundred, Sixty-eight and 02/100 ($368.02) per week;
 

 “19. [Harris] has suffered a 100% total disability as the proximate result of her on the job injuries for which [Harris] is entitled to receive compensation from [Wehadkee] at the rate of Three Hundred, Sixty-eight and 02/100 Dollars ($368.02) per week for [Harrises lifetime or the duration of [Harris]’s disability.”
 

 Wehadkee filed a motion to alter, amend, or vacate the judgment on October 21, 2008; the trial court denied that motion on November 14, 2008. Wehadkee filed its notice of appeal to this court on December 15, 2008.
 

 Standard of Revieiv
 

 Our review of workers’ compensation cases is governed by § 25-5-81 (e), Ala. Code 1975, which states:
 

 “(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
 

 “(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
 

 In
 
 Pipeline Technic, L.L.C. v. Mason,
 
 6 So.3d 1176, 1178 (Ala.Civ.App.2008), this court explained:
 

 “Substantial evidence is 1 “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d 262, 268 (Ala.1996) (quoting
 
 West v.
 
 
 *156
 

 Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)). ‘This court’s role is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are supported by substantial evidence and, if so, if the correct legal conclusions are drawn therefrom.’
 
 Bostrom Seating, Inc. v. Adderhold,
 
 852 So.2d 784, 794 (Ala.Civ.App.2002).”
 

 Discussion
 

 Wehadkee first argues on appeal that the trial court erred by awarding Hams permanent-total-disability benefits outside of the schedule provided in § 25-5-57, Ala. Code 1975 (“the schedule”), because, Weh-adkee argues, there was not substantial evidence to support the trial court’s award of benefits to Harris for an injury to her right upper extremity. Specifically, Weh-adkee asserts that there is no support for the trial court’s finding that the injury affected any area of Harris’s body other than her right wx-ist and her right thumb or that those injuries interfered with the efficiency of Harris’s other body parts.
 

 In
 
 Ex paite Drummond Co.,
 
 837 So.2d 831 (Ala.2002), the Alabama Supreme Court adopted the following test regarding the removal of an injury extending to other parts of the body from the schedule: “ ‘[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.’ ” 837 So.2d at 834 (quoting 4 Lex K. Larson,
 
 Larson’s Workers’ Compensation Law
 
 § 87.02 (2001)).
 

 In
 
 Boise Cascade Corp. v. Jackson,
 
 997 So.2d 1042 (Ala.Civ.App.2008), this court explained:
 

 “Based on the holding in
 
 Ex parte Jackson,
 
 [997 So.2d 1038 (Ala.2007)], in order to prove that the effects of the injury to the scheduled member ‘extend to other parts of the body and interfere with their efficiency,’ the employee does not have to prove that the effects actually cause a permanent physical injury to nonscheduled parts of the body. Rather, the employee must prove that the injury to the scheduled member causes pain or other symptoms that render the nonscheduled parts of the body less efficient.”
 

 997 So.2d at 1044. In the present case, Harris testified that her pain did not extend beyond two inches above her wrist. There is no evidence in the record indicating that Harris had pain or symptoms other than in her right thumb and her right wrist that rendered any other part of her body less efficient. The injuries to Harris’s right thumb and right wrists are injuries to scheduled members pursuant to § 25-5-57(a)(3).
 

 Based on
 
 Ex parte Drummond, Ex parte Jackson,
 
 997 So.2d 1038 (Ala.2007), and the evidence presented in the record in this case, we cannot conclude that Harris’s injury extended to other parts of her body and interfered with their efficiency so as to bring her injury outside the schedule. This is not the end of our inquiry, however.
 

 Wehadkee further argues that the trial court erred in finding that Harris was entitled to benefits outside the schedule based on the severe debilitating pain resulting from her injury.
 

 The Alabama Supreme Court stated in footnote 11 in
 
 Ex parte Drummond,:
 

 “This case does not present a situation in which the pain, although isolated to the scheduled member, causes a disability to the body as a whole. We recognize that pain can be totally, or virtually totally, debilitating, but this case does not present such a situation; therefore,
 
 *157
 
 we decline to address that situation here.”
 

 837 So.2d at 836 n. 11. In the present case, the trial court relied on
 
 Masterbrand Cabinets, Inc. v. Johnson,
 
 984 So.2d 1136 (Ala.Civ.App.2005) (plurality opinion), aff'd,
 
 Ex parte Masterbrand Cabinets, Inc.,
 
 984 So.2d 1146 (Ala.2007), in awarding Harris benefits outside the schedule. In
 
 Johnson,
 
 this court, in an attempt to apply footnote 11 in
 
 Ex parte Drummond,
 
 stated:
 

 “Clearly, pain isolated to a scheduled member might be sufficiently constant and severe, even when the worker refrains from using the scheduled member, that it would cause a debilitating effect to the body as a whole that is greater than the disability resulting from the loss of, or the loss of use of, that scheduled member as contemplated by § 25-5-57(a)(3)[, Ala.Code 1975]. The Legislature undoubtedly assumed that there could be ongoing pain associated with the loss of or a permanent injury to a scheduled member. The question becomes whether the pain associated with a lost member, or with a permanently injured member even when the worker avoids the use of that member to the extent he or she reasonably can do so, either extends to other parts of the body and interferes with their efficiency or is sufficiently abnormal in its frequency or continuity and in its severity that it has a debilitating effect on the body as a whole.
 
 [3]
 
 We believe this understanding of the Legislature’s intent in enacting § 25-5-57(a)(3) is consistent with our Supreme Court’s holding in
 
 Ex parte Drummond,
 
 as well as with the repeated admonitions by our Supreme Court that the Workers’ Compensation Act is intended to serve a beneficent purpose and should be construed so as to effect that purpose.
 
 See, e.g., Ex parte Strickland,
 
 553 So.2d 593, 595 (1989).
 

 [[Image here]]
 

 984 So.2d at 1144-45.
 

 In
 
 Norandal U.S.A., Inc. v. Graben,
 
 18 So.3d 405, 414 (Ala.Civ.App.2009), however, this court declined to follow the rule as outlined in
 
 Johnson,
 
 and stated:
 

 “[W]e hold, consistent with the language from footnote 11 in
 
 Ex parte Drummond,
 
 that a worker who sustains a permanent injury to a scheduled member resulting in chronic pain in the scheduled member that is so severe that it virtually totally physically disables the worker would not be limited to the benefits set out in the schedule. To the extent the plurality opinion in
 
 Johnson
 
 states some other test, we reject that opinion.”
 

 In
 
 Graben,
 
 the trial court had made the following findings of fact relating to the pain resulting from the employee’s injury:
 

 ‘“11. The Court has carefully considered the pain experienced by [the employee] as a result of his right leg injury. The Court has considered the intensity of the pain, which the Court finds to average 7 out of 10 in intensity. The pain has been described as severe, throbbing, chronic, and sometimes sharp. The Court finds this is a reasonable description of his pain. This is true, even though [the employ
 
 *158
 
 ee] does not work and refrains from using the right leg to the extent he reasonably can do so. The behavioral observations made by the Court during the trial support these findings. The Court has considered the duration of the pain and finds it chronic and constant. [The employee] lies down several hours each day because of the pain. The Court observed that he ambulates slowly and in a guarded and protected fashion. The Court finds that he has poor balance and an extremely altered gait due to the weakness and buckling of his right leg. [The employee] now walks with the use of a cane. The pain has grown significantly worse with time. The severe pain experienced by [the employee] causes significant sleep disturbances for him. Additionally, [the employee] must take prescription medication for this pain, including medications for neuropathic pain.
 

 “ T2. The Court finds that the pain experienced by [the employee] as a result of his right leg injury is sufficiently constant and severe, even when [the employee] refrains from using the scheduled member, that it has caused a debilitating effect on his body as a whole. This pain impairs the body as whole in a manner not contemplated by the schedule. This ongoing pain is so continuous and severe that in a real sense, the effect of this pain is extending to other parts of his body and interfering with their efficiency. It adversely affects his ability to sleep, resulting in a material deterioration in his physical health.’ ”
 

 18 So.3d at 414. The trial court in
 
 Graben,
 
 just like the trial court in the present case, relied on
 
 Johnson
 
 in determining that, “based solely on the debilitating effect of the pain from the [employee’s] injury, the employee was entitled to compensation outside the schedule.” 18 So.3d at 414. In remanding the case to the trial court in
 
 Graben,
 
 this court stated:
 

 “In its factual findings, the trial court focused mainly on the frequency and severity of the pain caused by the employee’s right-knee injury. The trial court noted that this pain affects the employee’s ambulation and sleep patterns, but the trial court did not make any findings regarding any other effects of the pain on the employee’s physical abilities. More specifically, the trial court did not determine whether the effects of the right-knee pain virtually totally physically disable the employee. Because the legislature has declared that it is the trial court’s duty to make the appropriate factual findings,
 
 see
 
 Ala. Code 1975, § 25-5-88, we are required to remand the case so that the trial court can make the appropriate findings rather than search the record to reach our own conclusions.”
 

 Graben,
 
 18 So.3d at 416.
 

 In the present case, the trial court, in making factual findings with regard to Harris’s pain, referenced the test outlined in
 
 Johnson
 
 rather than the one discussed in
 
 G^-aben.
 
 Harris testified at trial that, after the surgery on her hand, her hand remained swollen and it still caused her pain. She stated further that, after the surgery, she could not write with her hand and she could not move her wrist.
 

 Wehadkee asserts that it is not necessary to remand the present case to the trial court, as was done in
 
 Graben,
 
 because, Wehadkee says, there is no evidence indicating that Harris’s pain met the standard enunciated in
 
 Graben.
 
 Wehadkee argues that a line of cases decided after
 
 Johnson
 
 declined to apply
 
 Johnson
 
 and award benefits outside the schedule in cases involving an employee’s debilitating
 
 *159
 
 pain, and, thus, Wehadkee argues, if the evidence in the present case fails to meet the standard enunciated in
 
 Johnson,
 
 it would surely not meet the heightened standard in
 
 Graben.
 
 We disagree. As stated in
 
 Graben,
 
 the
 
 Johnson
 
 case was a plurality opinion, which has “questionable precedential value at best.”
 
 Graben,
 
 18 So.3d at 415.
 
 See also Ex parte Discount Foods, Inc.,
 
 789 So.2d 842, 845 (Ala.2001). The cases decided after
 
 Johnson,
 
 but before
 
 Graben,
 
 were not required to follow
 
 Johnson.
 
 Thus, those same cases do not provide us with precedential value regarding the decision to award benefits outside the schedule based on debilitating pain in accordance with the standard outlined in
 
 Graben.
 
 In fact, this court observed in
 
 Graben
 
 that this court had cited
 
 Johnson
 
 on several occasions and had analyzed subsequent cases based on its reasoning, yet the court in
 
 Graben
 
 declined to make an independent conclusion based on the facts in the record upon a comparison of those facts to the facts presented in the cases that had cited or analyzed
 
 Johnson.
 
 18 So.3d at 416.
 

 Because in this case, as in
 
 Graben,
 
 the trial court improperly considered the standard enunciated in
 
 Johnson,
 
 we likewise remand the present case to the trial court with instructions that it make factual findings regarding whether Harris’s pain was such as to “virtually totally physically disable” her, as required by the standard set forth in
 
 Graben,
 
 18 So.3d at 416.
 

 Wehadkee next argues that the trial court exceeded its discretion by considering evidence of Harris’s vocational disability. Wehadkee is correct that the compensation of a scheduled injury is governed exclusively by § 25-5-57(a)(3), Ala.Code 1975, and that, when compensation is governed by the schedule, “evidence of vocational disability cannot serve to further any recovery.”
 
 Smith v. Michelin North America, Inc.,
 
 785 So.2d 1155, 1159 (Ala.Civ.App.2000). Because we are remanding this case to the trial court to determine whether Harris’s pain is such that it removes her injury from the schedule, however, we decline to consider at this time whether the trial court properly considered evidence of Harris’s vocational disability in fashioning Harris’s workers’ compensation award.
 

 Likewise, we decline to consider Wehad-kee’s final argument regarding the trial court’s finding that Harris was permanently and totally disabled as the result of the injury to her thumb. Because we are remanding the case to the trial court for consideration of whether to award Harris benefits outside the schedule, we decline to consider the trial court’s resulting finding that Harris was permanently and totally disabled.
 

 The trial court’s judgment is reversed, and the cause is remanded for further proceedings.
 

 REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . The parties stipulated that notice of Harris’s accident was proper under the Alabama Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975.
 

 [3]
 

 “3 By way of example, a worker could experience ongoing pain from an injured member that is so continuous and severe, even when the worker refrains from the use of that member, as to materially adversely affect the worker’s ability to use his mind or to concentrate to the degree necessary to accurately or safely perform various tasks. In a real sense, the effect of such pain could properly be considered as ‘extending] to other parts of the body and interfer[ing] with their efficiency.’ ”